# IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI

**First Judicial District Empanelled July 2014 TERM**

FILED
OCT - 2 2014
BARBARA DUNN, CIRCUIT CLERK
BY ________ D.C.

**TO THE HINDS COUNTY CIRCUIT JUDGES:**

## REPORT OF THE GRAND JURY

Jail

We have made a personal inspection of the County Jail located in the First Judicial District of Hinds County. While at the jail, we witnessed the immediate after effects of arson, a prisoner exposed himself to us and we witnessed a prisoner in possession of a cell phone (a felony). Jail staff informed the Grand Jurors inspecting the Jail that occurrences like these were beneath the Sheriff's notice. Additionally, we noted that there were not enough officers to secure the Jail. Those officers that were on duty there were frightened of the inmates. The inmates seemed to be in control of the Jail as a result of the shortage of guards. Because of the noted problems, we issued subpoenas for County and Jail staff to appear before the Grand Jury and explain the situation at the Jail in addition to our inspections.

As to the physical facilities, we find the Jail building in the First Judicial District of Hinds County is in adequate condition, and sufficient for the safekeeping, accommodation, and health of prisoners except as noted below:

Control room/ booking:

Control room needs updated cameras/ colored monitors.

Monitors are very dim it is necessary to turn out lights in order to see the images on the screen.

Elevator breaks down and has an odor.

The interview room, mold is visible on the air vent and ceiling.

The air vents are rusty and the building is not well ventilated. In addition, there are tiles missing from the ceiling. Water is visible on the floor.

Inmate area:

Mildewed tiles are in shower.

Tissue in door frames to prevent the doors from locking.

3rd floor lights are out in the hallway.

Room 307 has a 3" hole in window. (This in not the first report of this problem)

782-316

PLAINTIFF'S EXHIBIT A

GOVERNMENT EXHIBIT D

The 4th floor ceiling tiles hanging down from the ceiling.

Room 401d shower tiles missing and there is a crack in the glass.

Room 402 has a deadbolt missing. We are told that inmates disable lights in this area.

Room 406 has a window that is cracked.

Room 408 is completely destroyed.

Room 409 has a broken window. It is shattered and dangerous.

Room 412 has a crack in window and a sheet in top of door.

The kitchen and laundry room were okay at the time of inspection

Staffing:

Lastly, the staffing appeared to be inadequate in quantity and quality. A female deputy was supervising male inmates alone. Inmates were attempting to break glasses as we entered the floor. Neither staff nor inmates were initially aware that we were there.
More training and staff presence are recommended by this Grand Jury. Specifically, we recommend that guards be paid a rate that is competitive with surrounding counties. We recommend that additional training for guards be instituted. Current training is insufficient.

Jail Conclusion:

After hearing from the Sheriff and his team, we are of the opinion that Sheriff Lewis is incompetent to oversee the jail or keep pretrial detainees or state inmates in a safe manner or to keep the public safe from the inmates. Therefore, we recommend that any Hinds County Circuit Judge or Chancellor remove the jail from the sheriff's control and remove any power Sheriff Lewis has to supervise pre-trial detainees or inmates pursuant to Mississippi Code Ann. § 19-25-9 as he is incapable and unfit for this duty of his office.

Finally, our findings relate only to the fitness of Sheriff Tyrone Lewis to competently execute his office and should not be construed to interfere with any other agency or individuals review and attempts to improve the Hinds County Jail or detention facilities.

Courthouse

We have made a personal inspection of the County Courthouse located in the First Judicial District of Hinds County and find it is in good and safe condition except as noted below:

General- The security cameras are inadequate for the safety of the public. They are more than 25 years old.

All Courthouse elevators are in poor repair although some have been under repair.

Basement- The vents have suffered water damage.

Basement security cameras are put up with tape.

There are sharp metal edges on some corners that need to be repaired.

There is damage to the ceiling of the Election Commission's Office.

Carpet is a hazard and needs to be replaced.

Public men's restroom- urinals will not flush.

Public women's bathroom has a damaged vent, a sink with a broken handle, and poorly functioning toilets.

Circuit Clerk's Office- The linoleum style tile is a hazard in that it was laid on top of the previous carpet and keeps coming up. Some of the tile is currently held down with tape.

There is a constant drip of water from the ceiling that is damaging the Clerk's Office.

The air conditioner in the Clerk's Office has not worked for two or three years. When turned on it makes sparks and is a fire and electrical hazard.

All other floors are adequately safe.

Tax Related Books and Reports

We have examined the Tax books, reports and settlements of the County and find them in good condition and order as far as we can tell.

We now ask that we be excused.

AFFIDAVIT:

I am the foreman of the Grand Jury, and this is inspection report of the Grand Jury

Sandra L Watts
FOREMAN OF THE GRAND JURY

The above-named Grand Jury foreman personally appeared before me and made the above affidavit.

SWORN TO AND SUBSCRIBED before me this the 2Nd day of October 2014.

Barbara Dunn
CIRCUIT CLERK
HINDS COUNTY, MISSISSIPPI

IN THE CIRCUIT COURT OF HINDS COUNTY, MISSISSIPPI
FIRST JUDICIAL DISTRICT

RE: HINDS COUNTY JAIL

FILED
SEP 17 2013
BARBARA DUNN, CIRCUIT CLERK
BY D.C.

REPORT OF HINDS COUNTY GRAND JURY

Pursuant to Sections 13-5-55[1] and 47-1-31[2] and the Court's order of July 23, 2013, we, a duly sworn and empaneled Grand Jury appeared to perform our duties in accordance with our oaths of office. After reviewing the Assessment Report that was generated by Dr. James Austin as well as documentary evidence and an inspection of the Hinds County Detention Center by this Grand Jury on August 29, 2013, it is our opinion that the Hinds County Detention Center (HCDC) is in a deplorable condition and inadequately staffed. In its present state, the HCDC poses major security risks to inmates, staff of the facility, visitors to the facility and to the citizens of Hinds County. The facility also poses a major liability risk to Hinds County.

Due to the condition of the HCDC, we adopt the report that was generated by Dr. James Austin (see attached) as supplemented in this report. Furthermore, we request that the Court order both the Hinds County Board of Supervisors and Sheriff to enact the recommendations of Dr. Austin beginning as soon as possible. In addition to the Jail Administrator position that is recommended by the report, the jail administrator should be allowed to bring with him/her two additional employees that will be placed over training and security at the HCDC. The Jail Administrator shall be hired within six (6) months of the date of this report and paid a salary equal to that of the southeastern average. Within thirty (30) days of assuming the Jail Administrator position, the Administrator shall file a copy of the HCDC's policy and procedures manual with the Court and the Board of

---

1 Each grand jury which is impaneled shall make a personal inspection of the county jail, its condition, sufficiency for safe keeping of prisoners, and their accommodation and health, and make reports thereof to the court...
2 Each grand jury which is impaneled shall examine the records of county prisoners and their treatment and condition and report the same to the court.

Supervisors. Pod C of the HCDC should not be reopened unless and until the Jail Administrator has been hired and he/she has staffed Pod C with competent and trained employees.

In order to insure that the Grand Jury's recommendations are followed, a neutral team of monitors should be selected to inspect and report to the Court and Board of Supervisors every three (3) months regarding progress at the HCDC.

In order to alleviate the overcrowding problems at the HCDC, indictments should be returned within ninety (90) days of felony arrests. The District Attorney is required to take subsequent Grand Juries to the HCDC for inspections.

The Hinds County Board of Supervisors is financially responsible for the implementation of the recommendations of this report.

Respectfully submitted, this the 13th day of September, 2013.

GRAND JURY FOREPERSON

ASST. ATTORNEY GENERAL

Sworn to and subscribed before me this the 17 day of September, 2013.

Circuit Clerk

# Hinds County Detention Center Jail Assessment Report

## At the Request of the Hinds County Grand Jury

Prepared by

James Austin, Ph.D.
Robert Harris
Kenneth McBride

September 10, 2013

## Introduction

This report is an assessment of the Hinds County Detention Center (HCDC), also referred to as the Raymond Facility, at the request of the Hinds County Grand Jury. The Grand Jury is required by statute to inspect the jail condition, and the sufficiency of the safekeeping of the prisoners and their health and make thereof to the Circuit Court.

Over the past 18 months there has been a series of events that reflect a deteriorating security situation at the HCDC. The report examines the following components of the HCDC:

1. Staffing Levels
2. Physical Plant
3. Jail Operations
4. Inmate population attributes.

Recommendations that are urgently needed are made on behalf of the Hinds County Grand Jury. Once implemented, we are confident the recommendations will fundamentally alter the current security and crisis situation at the HCDC.

## On-Site Activities

The investigation team arrived at Hinds County on Monday August 26, 2013. The first meeting was with Sheriff Tyrone Lewis and his executive staff plus the State's Attorney staff assigned to the Grand Jury (Stan Alexander and Marvin Sanders). All of the requested documents had been assembled and made available to the investigation team.

During the next three days we conducted numerous site visits to the HCDC during all three shifts. The site visits allowed us to observe shift briefings on the three shifts including the day-shift briefing at 5:45am; the evening –shift briefing at 1:45pm and the night-shift briefing at 9:45pm.

We conducted interviews of the shift supervisors and pertinent staff members such as Warden, Deputy Chief Phil Taylor; Facility Commander, Captain Sean Goforth and Health Services Administrator Floyd Brown.

Also, we observed all facility protocols and practices and reviewed documented department-wide policies and procedures.

Thursday meetings were held with the County Administrator, the Board of Supervisors and the Grand Jury. Dr. Austin attended the tour of the HCDC that was taken by a sub-committee of the Grand Jury during the late afternoon and evening.

During the week, Dr. Austin contacted and received numerous documents from Ronald Reid Welch, who is the Attorney of Record for the Plaintiffs in the long-standing *Robert Wilson et al., v. Charles Barbour, Board of Supervisors et al.*, consent decree that originated in 1978.

It should be noted that all County officials and staff were fully cooperative with the investigation team. Their assistance and insight greatly facilitated smooth execution of the site visit. We deeply appreciate their assistance and insights that greatly facilitated our work.

## Overview of the HCDC and Other Hinds County Detention Facilities

The HCDC was constructed in 1994. It has a design bed capacity of 594. Current correctional practices assume that a jail should never operate at its full bed capacity to allow the housing and movement of special management inmate populations. Based on that principle, the inmate population should not exceed 90% of the design capacity or 535 inmates.

The facility is a direct supervision unit, which has three major pods (A, B and C) with four separate units in each pod. There is also a booking area that has both single cells and booking holding rooms. All of the intake booking cells currently house disruptive inmates. Finally, there is a mental health/medical unit that has limited holding areas for those that have acute medical or mental health problems.

Since the riot in 2012 that occurred in C-Pod, that unit has been closed for renovation leaving an approved bed capacity of 415. However, jails cannot operate at full capacity. Again, the common standard is for the jail's population not to exceed 90% of the design capacity. Based on that standard, the HCDC inmate population should not exceed 374 inmates.

By October 2013, the C-Pod renovation should be completed and ready for occupancy. However, as will be recommended in this report, the jail should not be fully occupied until additional renovations have been completed for Pods A and B.

The facility only houses males who are mostly pretrial felons. There are 86 women who are housed at the downtown Jackson Detention Center (JDC) facility (56 felons and 16 misdemeanors). Women are temporarily transferred to HCDC in order to receive medical care, which is not available at the JDC.

Currently, there are approximately 400 bookings per month or nearly 5,000 per year. Since the closure of C-Pod the Jackson City Police Department has not been

booking any arrestees at the Detention Center. These arrestees are now being booked at the downtown detention center where they are either released or transferred to nearby county jail systems. Based on the numbers of bookings and the current average daily population, the average LOS is 30 days, which is high compared to other medium sized jails.

In addition to the HCDC, there is a state county work center that has a capacity of 400 beds – 200 state inmates and 200 local misdemeanor beds. This facility was not visited but HCSD staff reported that it is not operating at its full capacity. During the week we were on-site the total population ranged from 225-250 inmates.

A summary of the total Hinds County inmate population of the three facilities is shown in Table 1. With regard to HCDC, there was an average of 435 inmates at the facility even though the population should not to exceed 90% of the 415 bed capacity or 374 inmates. Put differently, the facility needs to lower its population by an average of 61-62 inmates until all three pods are once again suitable for occupancy.

**Table 1. Average Inmate Populations August 24-26, 2013**

| Facility | Males | Females | Total |
|---|---|---|---|
| | | | |
| HCDC- Total | 435 | 0 | 435 |
| Pretrial Misd | 7 | 0 | 7 |
| Pretrial Felon | 408 | 0 | 408 |
| State Inmates | 20 | 0 | 20 |
| Work Center | 244 | 0 | 244 |
| Pretrial Felons | 14 | 0 | 14 |
| State Trusty | 113 | 0 | 113 |
| Sent Misd | 103 | 0 | 103 |
| JDC | 85 | 73 | 158 |
| State Trusty | 6 | 0 | 6 |
| State Inmates | 15 | 1 | 16 |
| Pretrial Felons | 64 | 56 | 120 |
| Sent Misd | 0 | 16 | 16 |
| | | | |
| Totals | 764 | 73 | 837 |

In addition to the number of inmates currently in custody within the HCSD three facilities, there is another group of Hinds County inmates who are being temporally housed in other county facilities. This transfer of inmates occurred after the disturbance in C Pod which led to its closure on July 12, 2012. Since then persons

arrested by the Jackson Police Department are being booked at the JDC and then housed in one of the following counties;

1. Madison;
2. Rankin;
3. Simpson;
4. Yazoo; and,
5. City of Jackson.

Since July 2012 through July 2013, Hinds County has been billed $635,714. For these custody costs covering 20,233 days of incarceration. On an annual basis this would represent a daily jail population of 56 inmates. Since this is a partial billing and accounting the final costs and number of incarceration days is likely to be higher and will continue until the entire jail is renovated as is being recommended in this report.

## Staffing

The HCDC is funded to support 260 security staff. While a full staffing analysis was not completed due to time limitations, this number appears to be adequate to manage the facility at full operational capacity. However, observations of the three shifts over a three-day period revealed the number of staff reporting for each shift was inadequate in terms of providing a sufficient number of staff to operate the key jail functions.

We also noted significant variance in the number of staff and supervisors reporting for duty on each shift over a three-day period. For example, the shifts had one or two supervisors. One shift had one Lieutenant and one Sergeant. One shift had two sergeants. The number of officers and post positions staffed varied from shift to shift, and the number of officers and staff count varied between 17 on graveyard and 32 on the 6 am-2 pm day shift.

For each shift four officers and a supervisor are designated to serve as the facility-wide emergency response team. But these five positions are filled by staff who are also assigned to critical post positions. If the emergency response team was activated, these officers would be taken from critical line staff positions, which would severely impact the facility's ability to maintain normal operations during an emergency.

All of the facility's control centers are inadequately staffed, which poses major security and liability risks for the facility. The main entry point into the facility is staffed by a single officer who must keep constant watch on cameras located at the facility entry points, respond to telephone and radio messages, keep logs of activities and persons who enter the facility, provide badges and identification and

screen for prohibited weapons and contraband while manning a metal detection system.

As we progressed to the jail's main control center, the post positions normally responsible for handling everyday security concerns and emergency contingencies from inside and outside the facility, was staffed by a single officer. That officer is responsible for manning an electronic switch board controlling ingress and egress to the major secure areas of the jail. This officer has to observe all of the monitor screens for all cameras located inside and outside the facility. The main control center officer has to answer numerous telephones and keep logs of daily activities. This officer is also responsible for initiating most emergency facility-wide responses to protect staff as well as inmates.

The booking area where there is a large number of admissions and releases from the facility and the location where the most disruptive inmates are housed had only a single security officer assigned to the afternoon/evening shift. The work that is required here would require at least one additional security position.

The "A" and "B" direct supervision pods on all shifts are staffed inside the four housing units primarily by female detention officers. The officer assigned inside the four units to supervise the inmates is responsible for the security of approximately 60 inmates housed on two floors. The officer is responsible for counts, notifying and preparing each inmate for visits and medical appointments, daily showers and delivering the meals to each cell and retrieving the food trays.

A single officer is assigned to the control room for the pod; the single pod control room officer who in most cases was another female detention officer is responsible for protecting and handling emergencies of the female staff member inside the four housing units in Pods A and B. The Pod control room officer is responsible for using an electronic control pad to coordinate with the officer stationed inside the pod to open and close inmate cells.

It should be noted that neither the internal or external electronic control boards can be used to close the inmate's cell doors. If the inmates were out in the day room (which is extremely rare), and there was a need to escort the inmates to their cells, placed in their cells, and then each cell door would have to be manually closed by staff.

The pod control room officer also is responsible for observing and monitoring two cameras at the ingress and egress points for the pod. They must respond to telephone and radio inquiries and complete written activity logs.

In summary, there is an insufficient number of security staff assigned to the three shifts. The most glaring shortages are as follows:

1. There are no "rovers" available to assist the staff assigned to the housing units.
2. Without these rovers it is not possible to provide the following basic functions:
    a. Daily security cell checks;
    b. Daily recreation;
    c. Visitation; and,
    d. Feeding inmates in the housing units in the common areas rather than in the cells.
3. At a minimum two rovers need to be assigned to each Pod for all three shifts.
4. There is a need to add one position to the main control room for the 6 am and 2 pm shifts.
5. There is a need to add one security position to the medical and mental health units for all three shifts and to provide adequate supervision for the suicide cases.
6. One additional position is needed for the booking and receiving areas for at least the first two shifts.
7. In order to effectively supervise visits and recreation, at least three escort post positions need to be filled for the morning and afternoon shifts.

The reason these required positions are chronically absent is due to the exceptionally high staff turnover rate. Based on data provided by both the Sheriff and the County Administrator, there were 200 staff terminations in 2012. For the first six months of 2013, there have been 80 terminations with a projected 160 terminations for the entire year. With these extra-ordinary high turnover rates, there is a constant shortage of staff being assigned to key post positions.

The starting salary for a detention officer is $21,816, which also negatively impacts the quality of people applying for work. Coupled with the absence of a formal training program and poor working conditions, there is little wonder why over half of the staff leave within a year.

During our tours it was common to discover that the staff assigned to the units to provide supervision and control had been employed for less than 60 days. The overall lack of experience in corrections is especially concerning within a "direct supervision" jail, which requires skilled staff who can effectively interact with inmates.

## Staff Training

With the exception of a few officers, the majority of the staff were hired and assigned to work in the jail without receiving any formal or legal certification. The few exceptions were former state prison or former Hinds County correctional officers. Additionally, almost half of the staff members working in direct contact with inmates are females.

As evidence of a critical need for training and the problems associated with excessive staff turnover, it is common for the supervisor to be completely unfamiliar with his/her staff, their experience and knowledge of facility operations. For example, while monitoring a shift briefing, the shift supervisor stopped briefing and asked an officer, "What is your name ma'am?". On another shift at the shift briefing, the shift Lieutenant said, "Some of you all have been here more than thirty days we will change your days off soon".

Additionally, there is no evidence of adequate training for staff to prepare inmates for release and returning to the community. Other than the few officers who have state level corrections experience, Department supervisors, managers and officers have not had basic detention officer training and certification. Additionally, there is no ongoing or specialized training for supervisors and managers. The facility does not have any basic training documents, job specifications nor post orders.

We observed a new-hired female officer assigned to the critical position of safeguarding the mentally ill inmates and suicide watch. She had no prior training to assist her in handling this critical inmate population.

The Hinds County jail staff at this facility has not attended a training academy; the facility does not have a policies and procedures manual; staff have not been trained in the proper use of force when necessary and there are no post orders.

## Facility Maintenance

The facility itself is owned by the County, and as such it is the obligation of the County to sufficiently maintain the facility. The HCSD is responsible for properly staffing and operating the facility. Such an arrangement requires close cooperation and coordination between the Board of Supervisors and the Sheriff.

To be charitable, there is a great deal of on-going conflict in this "arranged marriage" between the County and the Sheriff. The Sheriff claims that the County has failed to adequately maintain the basic maintenance needs of the facility. When they need a repair a work order is submitted but the County is slow to make the needed repair. Currently, there are several hundred work orders that have not been completed. The result is a facility that is in disarray in its basic electric, plumbing, smoke alarm, control boards, ventilation and security systems.

The County claims that when repairs are made the inmates quickly damage them again. For example, there are over 90 cells with no lighting in them. Other cells have lighting, but the light fixtures have exposed wires or are dangling from the ceiling. When repairs are made to the cell lighting, they are quickly damaged by the inmates who are being confined to their cells 23 hours per day. It is also noteworthy that during a recent

inspection by the Department of Health on May 30, 2013, the inspector made the following comment:

> Comments: Seven repeat violations from previous inspection. I could not finish my inspection of Pod B due to inmate violent outburst. The staff thought it was unsafe to continue my inspection in the pod. The first six cells were inspected in B4. B1. B2 & B3 pods were not inspected. Pod C is closed for repairs.

On the positive side, there are number of major improvements that when completed will significantly enhance the overall security of the current facility. These are as follows:

1. Retrofitting the security of all cell doors
   Inmates have been able to compromise the cell locking system. Each cell door is being retrofitted with new frames to ensure this cannot occur in the future. When completed, it will not be possible for the inmates to easily compromise the cell locking system.

2. There are 17 "emergency repairs" that have been recorded by County. Of these nine have been completed at a cost of $1.032 million since July 9, 2012. The remaining repairs will take care of the dis-functioning cameras, leaks in the rook, and razor wire needed for the recreation areas.

3. Complete Renovation of Pod C.
   This is the most important and positive development for the entire facility. The entire pod is being overhauled with respect to lighting, electrical, ventilation, cell doors, and plumbing. When completed the pod will be restored to its original if not improved condition. This work at a cost of $2.4 million will be completed by October 1, 2013.

   It is strongly recommended that the pod be housed with the lowest security and best behaved inmates, with proper staffing, and afforded all of the core inmate services that should be provided with respect to visitation, recreation, education services and feeding in the common areas. As much as possible inmate workers should also be assigned to the pod. This is to ensure that the proper inmate culture is established and that there will not be a repeat of the destruction that occurred previously.

4. New Inmate Information System
   Funds have been secured to completely replace the current and original, and now antiquated, inmate information system. When installed it will be far easier to track inmates by a number of key security factors and their current legal status.

5. New Cameras for the Control Centers
   The only functioning cameras are in the so called "Grand Hallway" and in certain outside and limited housing areas. Funds have been secured to install new cameras throughout the entire facility that will connect with the Main Control room and the three Pod control rooms.

6. New Electronic Cell Control Boards for the Three Pods and the Main Control Room.

   The three control boards for each of the three Pods will soon be replaced. At the same time the effort to have control boards in each housing unit within the Pod will no longer be attempted. This will allow the staff upon the instruction of the staff assigned to the housing unit to remotely open and close all cells.

## Inmate Discipline System

It goes without saying that in order to establish and maintain safety and order in a correctional facility, there must be a fair and effective disciplinary system. Such a disciplinary system requires trained staff who are accurately reporting violations of the disciplinary code, a disciplinary hearing process and a range of effective sanctions that serve to both punish current violations and deter future violations. Furthermore, there must be a diverse array of inmate privileges that encourage inmates to conform to institutional rules.

Currently, there is not a functioning inmate disciplinary system for the following reasons:

1. There are no positive incentives that would encourage inmates to conform to institutional rules.

   Currently, virtually all of the inmates are on a lock-down status. This means that regardless of their behavior they are being treated the same, which means being confined to their cells with the exception of receiving an occasional shower. There is no access to daily recreation, education programs, visits and work assignments.

2. There is not a functioning disciplinary hearing process.

   Correctional facilities must have staff who administer an effective disciplinary process. Specifically, a Sgt. or Lt. who is designated as the disciplinary hearing officer and an associate who investigates serious infractions prior to the hearing being conducted. An inmate handbook that explains the disciplinary code and process should be explained to the inmates during the classification process.

3. There is not a designated disciplinary segregation unit.

   For those few inmates who violate the most serious rule infractions there should be a unit that serves as the segregation unit. Inmates convicted of such violations would be sentenced to maximum of 30 days to segregation status.

Case 3:16-cv-00489-CWR-BWR Document 3-4 Filed 06/23/16 Page 18 of 24

## Inmate Classification System

All inmates, who are booked and are not immediately released from custody, should be classified by a unit of trained staff to determine to which custody level (minimum, medium, and maximum) they should be assigned.

The assessment should be done using an objective classification instrument that uses reliable and valid risk factors. There should be an initial and re-classification instrument with the former used for new bookings and the latter for after the inmate has been in custody for 60—90 days. The reclassification instrument assesses in-custody behavior while the initial is more risk-based in terms of pre-booking factors.

Based on that initial assessment the inmate would then be assigned to a housing unit of similarly situated inmates. In other words, there must also be a housing plan that identifies certain housing units by security level.

Finally, there would be a reclassification process that occurs after the inmate has been in custody for 60 days. The reclassification instrument, as noted earlier, is more focused on inmate behavior so that well-behaved inmates can progress to the minimum security/honor housing units.

Here again, currently, there is no such system in place at the HCDC. Staff members, when asked about the inmate classification system, said the Department did not have an inmate classification system. If, in fact, there is no classification system the, staff are at risk of not being aware of the potential to commit violence or attempt escape by an inmate. In summary, here are the specific parts of a classification system that are currently lacking:

1. There is not a stand-alone classification unit staffed with officers who have been trained in inmate classification and control all inmate movement.

   Such a unit would be headed by a Sgt. or Lt. level director with at least 2-3 associates. This unit interviews all inmates who are booked and not released after 24-72 hours. The unit would also conduct the reclassification reviews for all inmates who have been in custody for 60 days. That process would allow inmates to have their custody level adjusted based on their conduct. Eventually, the classification unit would govern the housing of all inmates at all three HCSD facilities.

2. The Sheriff does not have a validated inmate classification system that consists of an initial and reclassification scoring forms.

The HCSD did just locate a form that has been used in other jurisdictions that was designed by Dr. James Austin. However, that form is just for the initial assessment process and cannot be used for the reclassification process. Further, formal classification policies and a training curriculum for the objective classification system do not exist.

3. There is not a formal housing plan that determines what pods and units should house which types of inmates.

   A classification system needs a housing plan that indicates where minimum, medium, maximum and special management inmates (e.g., protective custody, disciplinary segregation, etc.) should be housed. Staff assigned to the dedicated units would be aware of the types of inmates they have to manage and interact with.

## Facility Operations and Security

The facility has been on a virtual lock-down status for the past several months. This is due to security breaches in the visitation and outdoor recreation areas that have not yet been repaired. At some point the facility needs to "re-open" and begin providing basic services and protection to staff and inmates. What follows is a description of the issues that must be addressed.

We observed evidence of many security breaches. In addition to the absence of emergency contingencies training (i.e., proper use of force, cell security and searches, hostage taking, riot response, fire and evacuation), there should be comprehensive security measures in place that should include the following issues of concern:

1. The outer perimeter security is inadequate. The external approaches to the jail buildings and structures is not properly secured in terms of cameras and routine staff patrols.

2. The closed circuit camera system installed with the intent to bolster security of the perimeter and other key locations is woefully inadequate. Specifically, there are not enough functioning cameras to cover the outer perimeter and other key internal locations. The cameras do not provide night viewing and pan-tilt-zoom capability. The camera system is not supported by digital video recording nor does it have dedicated staff to monitor the camera system.

3. As noted earlier, the majority of the detention officers have received little if any training prior to being assigned to a post position. Consequently, they do not appear confident and in control of the jail environment. They lack "Command Presence", and when asked if they felt secure several officers said they did not feel secure and comfortable with their team members.

4. Many essential inmate tracking functions are not computerized.

5. A large number of inmates were not wearing their wristbands, which creates a serious inmate tracking problem. The custody levels of the inmate population does not exist. Flagging inmates by special management groups and gang membership is not automated.

6. The facility has no directions, rules or procedures for staff to meet the needs of mentally ill inmates, high-risk offenders and inmates in protective custody. In the medical/mental health unit there is limited space for the inmates who are either on suicide watch or have a severe mental health condition. Each day that we toured the suicide watch inmates where living on the floor of the unit. The others were crowded into the limited housing areas. The single officers responsible for supervising these high risk inmates had no special training in mental health issues, medication requirements or instructions on what to do if the inmates start exhibiting mental health problems.

7. The fire alarm systems and fire control boxes located throughout the facility in the various control booths are all in a state of disrepair. The red cabinet doors containing the fire extinguisher have no locking mechanisms. Also, the fire turnout gear is not properly displayed, negating its accessibility inside the Pod Control Center.

8. Smoke detectors and lighting do not work in as many as 90 cells.

   During the evening tours of the facilities, the inmates have no lighting to read any materials from sun-down to sun rise. Staff are unable to view inside the cells unless the cell door opened.

9. Due to a lack of staff assigned to the housing units, the cells are dirty and have poor lighting and ventilation. Because of the inadequate number of staff in the housing units, cells are not being inspected on a regular basis. Inmates are not leaving their cells except for occasional showers. Consequently, the cells are filled with a variety of food and other personal hygiene items. Clothing is hanging form make-shift close lines that are hanging from defective lighting fixtures with exposed wiring. The covers over the ventilation ducts are stuffed with paper moderate the flow of cold air through the duct system.

10. Radio communication--the major source of communication among staff members--is poor, and the radios do not work well.

11. Primarily due to inmate manipulation, the inmate cell locks are defective and all the security doors are suspect.

12. Most of the ceilings have large open holes with hanging portions of tile, damaged emergency fixtures and lights with dangling electrical wires. The cell windows are either broken or have holes.

13. The numerous water pipes inside the inmate housing units are rusted, busted, and protruding through the walls.

14. The recreational areas are filthy, and the overhead chain link fences were compromised and ideal for an inmate to escape.

15. Most important are the control panels inside both the Pod Control Center and Inmate Living Quarters fail to provide maximum control. Neither panel could close the inmate cell doors; each panel could only open inmate cells.

16. There is a gun-locker area with approximately twenty lockers, located in an outside alcove, used by transportation to receive inmates for booking. The lockers have 20 different padlocks owned by the employees who have placed weapons and other items in the locker. Security conscious managers have no way of opening these lockers to check them for contraband. This area is an excellent way and a source for introducing contraband, drugs, etc. into the jail.

## Crowding and Inmate Population Reductions

The current population in the HCDC needs to be reduced by 60-70 inmates. It can be done by basically implemented two reforms that will safely lower the pretrial felon inmate population.

The first recommendation is to place time limits on how long a person can be in custody before that person is indicted. Currently there is no limitation. In many jurisdictions the prosecutor has up to 30 days to formally charge a defendant with criminal charges. Such a standard if adopted by the courts would have a pronounced impact on the male and female pretrial populations.

We received a data file from the County Administrator that listed the number of days in custody to date. For the 790 inmates who are not under state jurisdiction (not MDOC inmates), the average time in custody to date is 190 days. Over 125 inmates have been in custody for more than one year. During our tour we encountered many inmates who had not been indicted for any offense for several months.

A third option to be explored is to transfer minimum custody inmates to the Work Center which has some 60-70 empty beds at any given time. These beds are open dorm units but given that sentenced minimum custody felons form the state DOC

Case 3:16-cv-00489-CWR-BWR Document 3-4 Filed 06/23/16 Page 22 of 24

prison system are already safely assigned to the facility, minimum custody pretrial inmates could also be safely housed there as well.

## Recommendations

As indicated above, the current security situation at the HCDC is in dire need of reform and requires immediate actions by County officials to avoid further injuries, deaths and physical damage to the facility. The County has considerable exposure to civil litigation if the recommendations listed below are not implemented as soon as possible.

### Staffing

1. Immediately redeploy as many least 20 Deputies now assigned to warrants or field patrol duties with corrections experience to the HCDC facility to fill the following vacant posts;

    a. Two rovers each on all shifts for Units A and B. Adding these officers would allow for physical inspection of all cells each day, plus, feeding of inmates in the common areas.
    b. One additional officer for the medical mental health unit
    c. Three escort officers on the morning and afternoon shifts to facilitate daily recreation and visitation for minimum and medium custody housing units.
    d. One additional officer to be assigned to the booking area to ensure at least two officers are assigned to that location for all shifts on all days.
    e. Once the jail population security has been restored some of these Deputies can be re-assigned to their warrant and patrol duties.

2. Recruit and Hire a Jail Administrator who will have over-sight over all three Hinds County Correctional facilities.

    This position is essential for any of the other recommendations to be implemented. The person hired should have at least ten years experience in a management position for medium size jail or prison system.

    Further, the person hired should have a minimum of a bachelor's degree, preferably a masters, in a jail/prison/corrections related area, plus a minimum of ten years experience in a management position for medium size jail or prison system. The Sheriff may recommend for hire a qualified Jail Administrator, with confirmation by the Board of Supervisors, of the position, person and the appropriate salary.

3. A complete updated staffing study needs to be completed. Such a study would build upon the recommendations made hear but would provide for a more careful analysis of the number and type staff required to safely manage not only the HCDC but also the JDC and Work Centers.

## Facility Renovation and Maintenance

4. The Board of Supervisors should immediately approve funding to renovate Pods A and B. At no time should the facility be fully occupied until all three Pods have been fully renovated including the Pod's recreation and visiting areas. This means that over the next nine months one Pod will be closed for a three - four month renovation period.

5. As the facility's Pods are renovated other renovations for the administrative areas (especially the booking and records rooms) should be completed.

6. The large outdoor recreation areas that are external to the interior recreation areas should be retro-fitted with adequate fencing to permit team recreation events (e.g., softball, track, etc.)

7. The three person maintenance staff should be located in a permanent work space with sufficient storage space to store critical replacement items that can be used within 24 hours.

8. All cells will be visually inspected each day to check lighting, smoke detectors, cell locking and ventilation ducts, as well as contraband. All cells that require repair should be noted and referred to maintenance by the end of the shift to include commodes, sinks, showers, and personal hygiene items.

## Classification and Discipline

9. Establish a four person dedicated classification unit headed by a Sgt. or Lt. with correctional experience. This unit will be charged with using an objective classification system to determine each inmate's custody level. The unit will need training and consultation on the use of such a system.

10. Through the classification process, identify inmates who are conforming to the rules and assign them to minimum and medium custody housing units. These inmates will be fed in the units common areas, afforded daily recreation and will be allowed visits.

11. Pod C, when re-opened in October 2013, should be occupied only by minimum and medium custody inmates.

12. Immediately establish a maximum security 60 bed unit within Pod A or B where the most disruptive inmates are segregated in single cells and receive limited recreation and showers.

13. Begin providing daily recreation and visits to the minimum and medium custody inmates.

## Population Reduction at HCDC

14. The maximum number of inmates housed at HCDC with Pod C closed should be 374 inmates. This population cap should be enforced until all three Pods have been renovated. It is estimated that full renovation will take approximately nine months to complete. Once the facility is fully operational the population should be capped at 535 inmates.

15. The Circuit Court should adopt a 30-45 day rule that requires the prosecutors to secure an indictment within that specific time frame. If an indictment is not secured, then the detainee should be released from custody, to await indictment while out on bond or house arrest. On the 1st day of each month, the Sheriff should provide to the Senior Circuit judge and District Attorney a list of all detainees in jail for 45 days, without secured indictment.

16. In 2004 Hinds County contracted with Probation Services Company (PSC) to provide pretrial monitoring of defendants. The monitoring varies, and includes call-in, actual probation visits and electronic bracelet/ house arrest. Indigent monitoring costs are paid by the county to avoid the $40 day jail cost PSC should be more readily used by all Circuit Court judges, especially for low to moderate severity offenses where a defendant has a problem making bond or the inmate has a severe medical condition. Such an expansion of the PSC for low risk defendants who are unable to post bail would lower the pretrial population.

17. A number of low custody pretrial inmates could be transferred to the Work Camp which has over 75 available beds. This should only be done once the HCDC inmates have been properly classified using an objective classification system as recommended above.

Submitted by:

James Austin, PhD

Date: 9/10/13